UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                        :

JOANNE PUGNI,                                No. 05 Civ. 8026 (CM)(LMS)

                   Plaintiff,             ECF CASE

               -against-                      :

READER'S DIGEST ASSOCIATION, INC.,        :

                Defendant.                 :
------------------------------------------------------------------ x

## DEFENDANT'S STATEMENT IN COMPLIANCE WITH RULE 56.1[1]

1.       Reader's Digest produces and distributes magazines, books, music, videos and other related products. (Campbell ¶3).

2.       QSP, Inc ("QSP"), a wholly-owned subsidiary of Reader's Digest, is a world leader in helping children and adults raise funds for their schools and worthwhile organizations through magazine drives and gift and food programs. (Id.).

3.       QSP's principal contact with its fund-raising organization customers is through its

---

[1] Defendant also submits: (1) Defendant's Memorandum of Law in Support of its Motion for Summary Judgment; (2) the Affidavit of Joel Cohen, Esq., sworn to August 31, 2006, and the exhibits attached thereto; (3) the Affidavit of Nancy Andrews, sworn to August 28, 2006, and the exhibits attached thereto; (4) the Affidavit of Marcela Bobe, sworn to August 18, 2006, and the exhibits attached thereto; (5) the Affidavit of Lila Campbell, sworn to August 17, 2006, and the exhibits attached thereto; (6) the Affidavit of Sue D'Emic, sworn to August 29, 2006, and the exhibits attached thereto; and (7) the Affidavit of Kim Van Orman, sworn to August 16, 2006, and the exhibits attached thereto. All affidavits are referred to herein as "[Last Name] ¶ [paragraph number]" or "[Last Name] Ex. [exhibit number]" Exhibits referred to herein are filed under seal pursuant to the confidentiality stipulation executed by the parties. Relevant pages of the deposition transcripts of Plaintiff, Joseph Nieto ("Nieto"), Jennifer DiBennedetto ("DiBenedetto"), and Lydia Strickland ("Strickland") are attached to the Cohen Affidavit and are designated herein as "[Last Name] [page number]."

field sales representatives ("sales reps"), who are located throughout the country and receive commissions based on their sales. (Id.).

4.      Sales reps' salary and commissions are calculated by accounting and finance personnel working out of Reader's Digest's headquarters in Pleasantville, New York (the "Home Office"). (Id.).

5.      Reader's Digest attempts to provide its employees with a work place free from discrimination and harassing conduct and, in connection therewith, maintains a "Harassment Free Workplace" policy (the "EEO Policy" or the "Policy"), which strictly prohibits all forms of discrimination, harassment and retaliation. (Id. at ¶4, Ex. A).

6.      The Policy contains a complaint procedure, which provides that, among other things, an employee who believes that he or she has experienced conduct that is prohibited by the Policy should file a complaint with their manager, supervisor or a Human Resources representative. (Id.).

7.      Reader's Digest maintains a Code of Conduct (the "Code"), which, among other things, sets forth the Company's prohibition on discrimination, harassment and retaliation. (Id. at ¶5, Ex. B).

8.      To ensure that all employees have access to the EEO Policy and the Code, each is maintained on Reader's Digest's intranet. (Id. at ¶5).

9.      Reader's Digest's commitment to providing equal employment opportunities is monitored and enforced by its Human Resources Department ("HR"). (Id. at ¶6).

10.      HR and the Legal Department are consulted on termination and discipline decisions and are available to respond to and redress employee complaints regarding perceived harassment or discrimination. (Id.).

11.     Reader's Digest also provides its employees and managers with regular training regarding its EEO-policy and related issues including discrimination, harassment and retaliation, as well as the Company's policies relating to these topics. (Id. at ¶7).

12.     From January 2003 to early 2004, Reader's Digest conducted a diversity training program in QSP entitled, "Valuing Diversity; Respect at Work" (the "Training Sessions"). (Id. at ¶8).

13.     The Training Sessions were rolled out over a number of months to senior management, QSP's field sales management, QSP's sales reps and employees working for or supporting QSP in the Home Office. (Id.).

14.     In or about December 2003 or January 2004, Joanne Pugni ("Plaintiff") attended a Training Session conducted by Kim Van Orman, ("Van Orman"), then Director of Human Resources supporting QSP. (Pugni 46; Campbell ¶8; Van Orman ¶¶2-3).

15.     During the Training Session, Plaintiff received training on the EEO Policy and its complaint procedure. (Id.).

16.     Reader's Digest hired Plaintiff on or about July 6, 1999, as an Administrative Assistant in QSP. (Pugni 13; Campbell ¶10, fn 4).

17.     Reader's Digest promoted Plaintiff on two occasions -- on or about April 22, 2000 to the position of Field Compensation Coordinator, Level 4, and on or about October 1, 2003 to the position of Field Compensation Coordinator, Level 5. (Pugni 13-15; Campbell ¶10, fn 4).

18.     When Plaintiff became a Field Compensation Coordinator, she began reporting to Peter D'Urso ("D'Urso"), a Senior Financial Analyst for QSP. (Id.).

19.     D'Urso was in large part responsible for Plaintiff's second promotion. (Pugni 21-22).

20.     D'Urso was responsible for Plaintiff's receipt of a Great Performers Award in January 2003 and early February 2004.  (Cohen Exs. G, H).

21.     A Great Performer's Award is a small cash gift or gift card, which is given to an employee who performs well on a particular project.  (Nieto 74-76, 86-87; 146-47).

22.     A Great Performer's Award is not related to an employee's overall job performance.  (Id.).

23.     Plaintiff and D'Urso generally were responsible for calculating and overseeing commission payments for QSP's sales reps (totaling approximately 450 individuals).  (Andrews ¶3, fn 4; Campbell ¶36).

24.     From the time that Plaintiff began working at Reader's Digest in 1999, she and D'Urso were friends.  (Pugni 15, 17; Nieto 144-45; Strickland 24).

25.     D'Urso and Plaintiff socialized outside of the office, had lunch together and went out for drinks.  (Pugni 15-16, 29-30).

26.     Plaintiff and D'Urso attended a business trip in Dallas in 2002.  (Pugni 28-31; Andrews ¶5, Ex. A).

27.     During the business trip to Dallas in 2002, Plaintiff spent two evenings with D'Urso and other co-workers at a bar.  (Id.).

28.     D'Urso slept in Plaintiff's hotel room two nights during the business trip to Dallas in 2002.  (Id.).

29.     D'Urso and Plaintiff regularly discussed intimate details of each other's lives, including family, careers and personal issues.  (Pugni 17-18, 24-25; Nieto 145).

30.     Joseph Nieto ("Nieto") former Controller, QSP, testified that prior to 2004, Plaintiff and D'Urso were so friendly that they referred to each other as my "work husband" and "work wife." (Nieto 144)

31.     Lydia Strickland ("Strickland") testified that Plaintiff and D'Urso's pre-2004 relationship was like that of a bickering old married couple. (Strickland 25-26).

32.     D'Urso confided in Plaintiff about his family and his relationship with his wife, and Plaintiff shared her infertility problems with D'Urso and confided in him about her numerous miscarriages. (Pugni 24-25; Nieto 145).

33.     D'Urso's and Plaintiff's families knew each other. (Pugni 15-16, 34-35).

34.     D'Urso socialized with Plaintiff's husband and Plaintiff knew D'Urso's wife and children and visited D'Urso's home. (Id.).

35.     At no point during their friendship or thereafter did D'Urso sexually proposition Plaintiff. (Pugni 19-20).

36.     D'Urso generally  was demonstrative with everyone at Reader's Digest, would talk to Strickland and would frequently touch Strickland's arm during conversations. (Strickland 28-30).

37.     On the morning of Tuesday, February 17, 2004,[2] Plaintiff complained to Nieto that on Thursday, February 12th, another QSP employee, Lori Novella ("Novella"), saw D'Urso in Plaintiff's office (while she was not there) looking through her gym bag (which contained her gym clothes)(referred to herein as the "Incident"). (Pugni 67-68; Van Orman ¶¶4-5).

38.     Novella informed Plaintiff of the Incident on February 13th. (Pugni 67; Van Orman ¶5).

---

[2] All dates referenced hereafter are in 2004 unless otherwise indicated.

39.     Immediately after speaking to Plaintiff, Nieto informed his supervisor, Will Price ("Price"), then the Chief Financial Officer ("CFO") of QSP, of the Incident, and together they contacted HR and spoke to Van Orman. (Nieto 33-35; Van Orman ¶¶4-5).

40.     After consulting with her supervisor, Lila Campbell, then Vice President of Human Resources for QSP ("Campbell"), and the Legal Department, Van Orman began investigating Plaintiff's allegations regarding the Incident by 10:00 a.m. on February 17th, contacting and questioning Plaintiff, D'Urso and Novella. (Pugni 68-70; Campbell ¶10; Van Orman ¶¶7-12, Exs. A-G).

41.     During Plaintiff's recounting of the Incident to Van Orman on February 17th, she indicated that while she and D'Urso had been friends in the past and that he had not previously done anything that she felt was inappropriate or made her feel uncomfortable, she no longer wanted to report to him as a result of the Incident. (Pugni 69-70; Van Orman ¶¶7-8, Exs. A-B, G).

42.     During Van Orman's conversation with Plaintiff on February 17th, Van Orman reassured Plaintiff that, in accordance with the Policy, she was protected from retaliation as a result of her complaint. (Van Orman ¶9, Ex. B).

43.     When Van Orman met with Plaintiff to discuss the Incident on February 17th, Plaintiff did not complain about any purported conduct by D'Urso that occurred prior to the Incident. (Pugni 68-70; Van Orman ¶7-10, Exs. A-B).

44.     Plaintiff never once complained to HR about D'Urso's conduct prior to the Incident. (Pugni 39).

45.     D'Urso visited Plaintiff after the Incident to apologize for the Incident, even crying over the situation. (Pugni 26-27, 71, 76-78, 100-01, 104-06; Cohen Ex. L).

46.    During Van Orman's meeting with D'Urso on February 17th, he admitted that he went into Plaintiff's office to return a file and that, while doing so, he saw Plaintiff's gym bag and opened it, but denied touching or taking anything in it.  (Van Orman ¶12, Exs. E-F).

47.    D'Urso appeared to Van Orman to be remorseful about the Incident, and informed Van Orman that he had apologized to Plaintiff and also indicated to Van Orman that, prior to the Incident, he and Plaintiff had been friends.  (Id.).

48.    Following Van Orman's interviews, on February 17th, she prepared a summary of her investigation and consulted with Campbell and the Legal Department.  (Campbell ¶11; Van Orman ¶¶12-13, Ex. G).

49.    On February 17th, the same day that Plaintiff complained about the Incident, Reader's Digest decided to immediately change Plaintiff's reporting structure so that she would report to Nieto rather than D'Urso, and to relocate Plaintiff's office away from D'Urso.  (Pugni 72, 116; Nieto 37-39; Campbell ¶11; Van Orman ¶13).

50.    Reader's Digest also recommended that Plaintiff and D'Urso utilize the Employee Assistance Program to obtain counseling, and instructed D'Urso to: (i) limit his discussions about the Incident or Plaintiff; and (ii) limit his contact with Plaintiff except where professionally necessary and then to communicate with her only by e-mail whenever possible.  (Pugni 76-78, 88-89, Campbell ¶11; Van Orman ¶13).

51.    Reader's Digest concluded that while D'Urso's conduct was inappropriate and demonstrated extremely poor judgment, it did not believe that the conduct was sexual in nature or that it rose to the level of sexual harassment and did not place Plaintiff's safety in danger. (Campbell ¶12; Van Orman ¶14).

52.     Reader's Digest also believed that D'Urso's conduct with regard to Plaintiff was an isolated incident, as he had not done anything similar to the Incident in the past, nor had anyone else -- including Plaintiff -- ever complained to HR about any inappropriate conduct on his part. (Id.).

53.     For the reasons set forth in ¶¶51-52 herein, Reader's Digest determined that the appropriate sanction for D'Urso was a formal written warning, which would be maintained in his personnel file and considered as part of his next performance evaluation.  (Id.).

54.     On February 26th, Nieto and Van Orman met with Plaintiff to reiterate to her the actions that Reader's Digest had taken in response to her complaint.  (Pugni 76-78, 88-89, 116; Van Orman ¶15, Exs. H-I).

55.     During this meeting on February 26th, Van Orman confirmed that Plaintiff was satisfied with Reader's Digest's response to her complaints, was not concerned about her safety and did not have a problem working with D'Urso under the changed reporting structure. (Van Orman ¶15, Exs. H-I; see also Campbell ¶13).

56.     On March 2nd, Van Orman met with D'Urso to discuss the results of the investigation relating to the Incident, issue him the written warning, reiterate the directives previously given to him regarding his communications with Plaintiff and warn him that his failure to follow the directives would result in serious disciplinary action, up to and including termination. (Van Orman ¶16, Ex. J; see also Campbell ¶13).

57.     On April 1st, Plaintiff informed Nieto that she was "very happy with the way things were and happy with the new work she was being given and would like things to stay the way they are." (Cohen Ex. K).

58.     On April 8th, D'Urso had his young daughter (whom Plaintiff knew from their past friendship) in the office and, during such visit, brought her to Plaintiff's office to wave goodbye, which upset Plaintiff. (Pugni 33-34, Andrews ¶6).

59.     When Nieto learned that Plaintiff was upset by the events set forth in ¶58 herein, he consulted with Nancy Andrews, then Human Resources Manager responsible for supporting QSP ("Andrews"), and reprimanded D'Urso, telling him that he needed to accept that his friendship with Plaintiff was over and reminding him that he was not to speak with anyone regarding Plaintiff other than himself, Price or HR. (Nieto 59-60; Andrews ¶6; Cohen Ex. I).

60.     In addition, Nieto, in consultation with Andrews, informed Plaintiff of the actions he took in response to the events set forth in ¶58 herein. (Andrews ¶6).

61.     On April 22nd, Carolyn Roche ("Roche"), a QSP employee, reported to Nieto that she heard banging on the wall in Plaintiff's office for which she believed D'Urso was responsible. (Pugni 84; Nieto 63-64; Andrews ¶7, fn 9).

62.     Although Plaintiff's office had been moved following the Incident to separate her from D'Urso, his office shared a common back wall with Plaintiff's. (Andrews ¶7, fn 8).

63.     On the same day that Roche informed Nieto about the banging, Nieto questioned D'Urso, who denied that he was banging on Plaintiff's wall. (Nieto 63-64; Andrews ¶7).

64.     Although D'Urso denied banging on Plaintiff's office wall, on April 22nd -- the same day that Nieto became aware of the banging -- Andrews and Nieto decided to move D'Urso's office so he no longer shared a wall with Plaintiff's office, which move occurred within days of Roche bringing the issue to Nieto's attention. (Pugni 84, 115; Nieto 152-53; Andrews ¶7).

65.     On May 21st, Plaintiff brought a complaint of alleged retaliation to Nieto, reporting to him that she purportedly overheard D'Urso on a telephone call stating that her "days at Reader's Digest were numbered" and that she "screwed up a file." (Pugni 89-92; Nieto 67-68; Andrews ¶¶8-11; Campbell ¶16, Ex. D).

66.     On that same day (May 21st), Nieto informed Andrews of Plaintiff's complaint, and Andrews immediately reached out to Plaintiff and left her a voicemail, which Plaintiff did not return. (Id.).

67.     After Plaintiff informed Nieto that she would not speak to HR, Andrews and Campbell went to Plaintiff's office that same afternoon hoping to convince her to cooperate so that they could conduct a complete investigation relating to her May 21st complaint. (Pugni 89-92; Andrews ¶¶10-11; Campbell ¶¶16-17, Ex. D).

68.     Plaintiff continued to refuse to provide Andrews and Campbell with information regarding her May 21st complaint, upon the advice of her attorney. (Id.).

69.     Notwithstanding Plaintiff's refusal to provide Andrews and Campbell with information relating to her complaint, on May 21st -- the day Plaintiff complained -- both Andrews and Nieto spoke to D'Urso. (Nieto 67-68; Andrews ¶9, Ex. B).

70.     D'Urso told Andrews and Nieto that Plaintiff had taken his comments out of context, and that during the phone call in question he did not say anything about Plaintiff's continued employment at QSP but, rather, was referring to a former QSP employee. (Id.).

71.     Campbell ultimately informed Plaintiff by e-mail that HR believed that she had taken D'Urso's comments out of context, that the comments were neither discriminatory nor actionable and indicated that D'Urso was no longer Plaintiff's supervisor and did not have the

- 10 -

authority to assess her performance or impact her future with QSP.  (Pugni 91-92; 94-97; Campbell ¶20, Ex. F).

72.     Following the Incident, D'Urso was no longer Plaintiff's supervisor and he did not have the power to fire her or otherwise impact her future at Reader's Digest.  (Pugni 94-97).

73.     Campbell also reminded Plaintiff that per the EEO Policy, she was protected from retaliation and urged her to bring information to HR's attention if she felt that she was being retaliated against.  (Andrews ¶11; Campbell ¶17, Ex. D).

74.     In July, Plaintiff brought a complaint directly to HR for the first time, claiming that, in retaliation for her filing a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"), D'Urso was sabotaging her work by deliberately changing information that she had inputted into the UNIAPP System (the "System"), a computer software system that is utilized in calculating commission payments for the QSP sales force. (Pugni 117-19, 188-89; Andrews ¶12, Ex. C; Campbell ¶22).

75.     On the same day that Andrews learned of Plaintiff's complaint relating to the System, Andrews spoke to Plaintiff regarding her allegations, assured Plaintiff that she would conduct a thorough investigation and reminded Plaintiff that she was protected from retaliation. (Pugni 117-18; Andrews ¶¶13-14; Ex. E; Campbell ¶22).

76.     Thereafter, Andrews spoke to D'Urso, who denied Plaintiff's allegations, and also spoke to Nieto, who informed her that he previously contacted the Information Technology Department (the "IT Department"), which could not confirm Plaintiff's allegations, but nonetheless, to remedy Plaintiff's concerns, he had assigned D'Urso the sole responsibility going forward of inputting the necessary information into the System.  (Nieto 69-72; Andrews ¶15).

77.     After speaking with D'Urso and Nieto, Andrews contacted the IT Department, which confirmed that it was unable to track an individual user's activity within the System, making it impossible to confirm Plaintiff's allegations. (Andrews ¶16).

78.     In early September, Andrews informed Plaintiff that she was unable to confirm her allegations relating to the System. (Andrews ¶16, Ex. EE).

79.     Andrews was unable to conclude her investigation regarding Plaintiff's allegations relating to the System until early September because she and a number of the individuals with whom she needed to speak were on vacation in August. (Andrews ¶16, fn 13).

80.     In late August, following Nieto's return from vacation (from August 16-20), Plaintiff informed him that D'Urso had visited her office a number of times while he was away. (Pugni 104-06).

81.     Prior to this time, D'Urso had not been coming into Plaintiff's office with any frequency. (Pugni 178-79).

82.     Following the Incident, Nieto would receive occasional reports that D'Urso had been in Plaintiff's office and, on such occasions, Nieto would reprimand D'Urso and warn him that he would be terminated if he did not stay away from Plaintiff. (Nieto 48-52, 58, 150-51).

83.     Such an approach had been working to limit D'Urso's visits to Plaintiff's office prior to Nieto's vacation in August. (Pugni 178-79).

84.     During Nieto's vacation, Plaintiff did not complain to HR or QSP management about D'Urso's visits, nor did she contact Nieto on vacation about the visits. (Pugni 104-06; Andrews ¶18; Campbell ¶23; D'Emic ¶¶6-7).

85.     Upon Nieto's return from vacation and receipt of Plaintiff's complaint, he informed Andrews and his supervisor, Sue D'Emic ("D'Emic"), then North American Controller,

Accounting Resource Center, of the complaint and, on that same day, Andrews and D'Emic met with Plaintiff, during which meeting she reiterated her complaint regarding D'Urso's visits. (Pugni 108; Nieto 106-08; 150; Andrews ¶19; Campbell ¶24; D'Emic ¶¶6-7).

86.    The Accounting Resource Center (the "ARC") consolidated the accounting functions for certain of Reader's Digest's divisions within North America. (D'Emic ¶1, fn 1).

87.    The accounting functions for QSP were absorbed into the ARC in or about June 2004. (Id.).

88.    During Andrews and D'Emic's meeting with Plaintiff (as described in ¶85 herein), D'Emic offered to transfer Plaintiff to another comparable position within the ARC (located on another floor), but Plaintiff indicated that she did not want another job. (D'Emic ¶7).

89.    D'Emic and Andrews also spoke to D'Urso, who denied going into Plaintiff's office more than a couple of times during Nieto's vacation and claimed that the visits were work-related and that Plaintiff also had visited his office during this period. (Andrews ¶20; Campbell ¶24; D'Emic ¶8).

90.    During D'Emic and Andrews' meeting with D'Urso, D'Urso was instructed not to visit Plaintiff's office and to resume e-mail communication with her when necessary. (Id.).

91.    On September 14th, Plaintiff complained to Campbell that despite being directed otherwise, D'Urso continued to visit her office. (Pugni 201-03; Andrews ¶21; Campbell ¶25, Ex. I).

92.    A further investigation ensued, during which D'Urso again denied the allegations, and on September 15th, Plaintiff, for the first time, indicated that she had a log (the "Log") that listed all of the times that D'Urso visited her office between August 16th and September 14th; however, Plaintiff did not supply the Log to HR until September 17th, indicating that she would

not turn it over until her lawyer consented. (Pugni 109-12; Andrews ¶¶21-24, Exs. H-J; Campbell ¶¶25-27, Ex. I; D'Emic ¶¶9-10).

93.    The very next day -- September 18th -- Nieto, D'Emic and Andrews confronted D'Urso with the Log and D'Urso admitted that he had, in fact, visited Plaintiff's office on almost all of the occasions listed therein. (Andrews ¶24, Ex. K; Campbell ¶28; D'Emic ¶11).

94.    Following D'Urso's admission, Reader's Digest determined that he had lied and blatantly disobeyed the directive regarding contact with Plaintiff, warranting his termination without severance. (Nieto 107-08; Andrews ¶24-25, Ex. K; Campbell ¶28; D'Emic ¶12).

95.    Prior to informing D'Urso of his termination, QSP finance management and HR determined that they needed to find a replacement employee who could take over D'Urso's job duties immediately after his departure. (Andrews ¶26; Campbell ¶29; D'Emic ¶13).

96.    Marcella Bobe ("Bobe"), who had been working as a project manager in the ARC, was chosen as Compensation Analyst Manager, which position was responsible for, among other things, D'Urso's job functions. (Id.).

97.    D'Urso's employment with Reader's Digest was terminated effective October 5th. (Andrews ¶26, Ex. L).

98.    When Bobe became Compensation Analyst Manager in October, Plaintiff ceased reporting to Nieto and began reporting to Bobe. (Pugni 10-11; Bobe ¶1, fn 3).

99.    Bobe was not involved in addressing any of the issues surrounding D'Urso and Pugni and was not aware of the reason for D'Urso's termination or the specifics regarding the issues between D'Urso and Pugni. (Bobe ¶3).

100.   Bobe did not work in the same department as Plaintiff when she made her complaints about D'Urso and only began working with Plaintiff after Reader's Digest terminated D'Urso's employment.  (Id.).

101.   Plaintiff worked closely with Bobe and generally was responsible for gathering and analyzing data regarding the sales reps, which information Bobe would then use to calculate commission payments due to these employees.  (Pugni 10-11; Bobe ¶4).

102.   Because Bobe did not have experience in performing her new job functions, and did not receive training from D'Urso before his departure, Bobe initially relied heavily on Plaintiff to guide her through the compensation process.  (Bobe ¶4).

103.   Soon after Plaintiff and Bobe began working together, Bobe noted deficiencies in Plaintiff's performance -- namely that Plaintiff was not thorough and her work contained inaccuracies.  (Id. at ¶5).

104.   Bobe tended to supervise Plaintiff closely in part because of Plaintiff's tendency to make mistakes, and in part because she was new to her position.  (Id.).

105.   Plaintiff frequently complained to Bobe about her workload and the stressful conditions under which they worked, and often would threaten to quit.  (Id. at ¶6).

106.   Plaintiff testified that Bobe had a "very volatile personality" and was difficult with a lot of people prompting other area managers to bring their work to Plaintiff.  (Pugni 11, 218).

107.   In or about December, Bobe told Plaintiff that while she understood that their jobs were stressful, Plaintiff's threats to quit were unacceptable and Plaintiff had to decide whether to stay and try to be positive, or resign.  (Id.).

108. In an effort to motivate Plaintiff, Bobe told her that if she improved her attitude and performance deficiencies, during the next evaluation period in August 2005, Bobe would make sure that her evaluation of Plaintiff reflected such improvement and that she would recommend to Jeffrey Pachter ("Pachter"), then the CFO of QSP, that Plaintiff receive a promotion and a corresponding pay increase. (Bobe ¶6).

109. Following the conversation referred to in ¶108, although Plaintiff's attitude improved somewhat, her thoroughness and accuracy continued to be an issue for Bobe. (Bobe ¶7).

110. Although Plaintiff periodically complained about the daily grind and everyday stresses of her position, she never complained to Bobe or HR about the manner in which she was treated during the time that she and Bobe worked together. (Bobe ¶7-8; Campbell ¶¶30-31).

111. On June 13, 2005, Plaintiff did not report to work and did not call Bobe about her absence. (Bobe ¶8).

112. Instead, on June 13, 2005, Bobe heard from another QSP employee that Plaintiff did not plan to return to work. (Id.).

113. Subsequently, on or about June 14, 2005, Reader's Digest confirmed that Plaintiff resigned her employment on June 10, 2005 by hand delivering a letter to Tom Ryder ("Ryder"), the Chief Executive Officer of Reader's Digest (to whom she had not previously complained), claiming that she was constructively discharged. (Pugni 217; Bobe ¶8; Campbell ¶31; Cohen Exs. E, F).

114. Plaintiff testified that she resigned from Reader's Digest because Bobe, to whom she began reporting in October 2004, had a "very volatile personality," prompting area managers

and other employees to contact Plaintiff rather than Bobe and because Bobe had a difficult personality. (Pugni 11, 218).

115.    Bobe never had an opportunity to prepare an evaluation for Plaintiff or to determine whether to recommend to Pachter that she receive a promotion and pay increase because of Plaintiff's resignation on June 10, 2005 – was prior to the time for completing performance evaluations. (Bobe ¶6, fn 5).

116.    On June 15, 2005, Campbell sent a letter to Plaintiff asking her to reconsider her resignation decision. (Campbell ¶32, Ex. J).

117.    Plaintiff never responded to Campbell's letter, and Reader's Digest later learned that Plaintiff resigned within a few days after obtaining a job offer at another company, MBIA Investment Management Corp ("MBIA"). (Pugni 5-6, 9; Campbell ¶32).

118.    Plaintiff's position with MBIA "landed in [her] lap" through a friend of her husband. (Pugni 6-7, 9-10).

119.    Prior to the MBIA opportunity, Plaintiff's only efforts to find a job had been to post her resume on Monster.com and continue her long standing practice of reading the papers to "see what other opportunities were out there." (Pugni 6-7, 9-10).

120.    Plaintiff's abrupt resignation, which occurred two weeks prior to the end of Reader's Digest's fiscal year, created a hardship for QSP, as there was a significant amount of work for Plaintiff to complete prior to year-end. (Bobe ¶8, fn 7).

121.    D'Urso never sexually propositioned Plaintiff or touched her after the Incident. (Pugni 101-02).

122.    D'Urso was a very emotional person and cried in front of other Reader's Digest employees. (Pugni 26-28, 116; Cohen Ex. L).

123.   D'Urso cried to Nieto (a male) in March 2003 and cried to another co-worker, Strickland, about the Incident and Plaintiff's refusal following the Incident to acknowledge D'Urso and his daughter.  (Pugni 26-27, 116; Nieto 21-23, 58-60, 116; Strickland 14, 17, 31).

124.   Nieto received complaints about D'Urso's emotional behavior from both male and female employees.  (Nieto 58-60, 130-31).

125.   Plaintiff was not subject to vulgar comments or sexual advances by D'Urso and D'Urso never touched her or sat on the arm of her chair following the Incident.  (Pugni 19-20, 101-02).

126.   Plaintiff did not personally witness the Incident and D'Urso repeatedly apologized for his conduct with regard to the Incident.  (Pugni 67-68, 100-01).

127.   D'Urso's visits to Plaintiff's office after the Incident encompassed attempts to apologize and mend their friendship and to discuss work-related matters.  (Pugni 26-27; 76, 100-06; Nieto 36-37; 48-50, 95-96; Andrews ¶ 24, Ex. J).

128.   Nieto criticized Plaintiff's performance in certain respects in his August 2004 performance evaluation of her (the "August 2004 Evaluation").  (Nieto 79-83; D'Emic ¶5, Ex. A).

129.   The August 2004 Evaluation had no impact on Plaintiff's compensation or duties. (Pugni 223-24; Nieto 153; Bobe¶6, Campbell ¶10, fn 4).

130.   The August 2004 Evaluation (which covered the period from July 1, 2003 through June 30, 2004) was Nieto's first opportunity to directly review Plaintiff's performance (as she started reporting directly to him following the Incident) and it reflected his dissatisfaction with her limited skill set and his belief that she did not grasp the intricacies of her position, after having worked in QSP for more than five years.  (Nieto 79-83; D'Emic ¶5, Ex. A).

131.   Nieto indicated in the August 2004 Evaluation that Plaintiff failed to meet the position's requirements in four areas, but also noted that previous lack of supervision by D'Urso contributed to his assessment of Plaintiff.  (D'Emic ¶5, Ex. A).

132.   Before Nieto gave Plaintiff the evaluation, it was reviewed by D'Emic and Andrews to ensure that it was fair and accurate.  (Andrews ¶17; D'Emic ¶5).

133.   D'Urso was not consulted nor did he have any say in the performance evaluation that Plaintiff received in August 2004.  (Nieto 91-92, Andrews ¶17, fn 14).

134.   HR first learned of Plaintiff's complaints regarding D'Urso on February 17th. (Pugni 39-41; Nieto 144-45).

135.   Plaintiff was aware of Reader's Digest's complaint procedure as contained in the EEO Policy and that she had the option of bringing her complaints to HR if she was not satisfied with a response to a complaint made to a supervisor.  (Pugni 44-45, 47; see also Van Orman ¶3).

136.   Plaintiff testified that she did not bring her complaints to HR because she did not believe that HR was a well-regarding department.  (Pugni 48-49).

137.   Plaintiff failed to bring her harassment complaints to HR and only spoke to HR when an HR representative came to her after learning of the Incident.  (Pugni 39-40, 44-45, 68).

138.   On numerous occasions, Plaintiff refused to participate in HR investigations of her complaints, purportedly upon the advice of her attorney.  (Pugni 89-92; Andrews ¶¶10-11, 23-24, Ex. J; Campbell ¶¶16-21, Exs. D-H; D'Emic ¶10).

139.   Plaintiff's therapist advised her that she should to go to HR with her concerns relating to D'Urso, yet, Plaintiff failed to do so.  (DiBenedetto 91-93, 96-97, 100, 117-18).

140.   Bobe did not have the authority to change Nieto's performance evaluation of Plaintiff.  (Bobe¶6, fn 4).

141.    Bobe found that Nieto's August 2004 evaluation largely reflected the same issues she had with Plaintiff's performance.  (Bobe ¶6, fn 4).

142.    Plaintiff's 2003 evaluation, for which D'Urso was responsible, identifies nine areas of improvement -- demonstrating that deficiencies in Plaintiff's performance existed and were identified before the Incident and her complaints relating thereto.  (Cohen Ex. J).

143.    Nieto gave D'Urso a negative review in August 2004.  (Pugni 185-86; see also Nieto 95-97, 148-49; Andrews ¶17; D'Emic ¶5, Ex. B).

144.    In Nieto's August 2004 review of D'Urso, Nieto found, among other things, that D'Urso did not meet a number of technical competencies for his position and criticized his management skills based on his failure to address Plaintiff's deficiencies.  (Nieto79-83; D'Emic, Ex. B).

145.    Plaintiff testified that Nieto did not act against her because of her complaints. (Pugni 120-21).

146.    On May 24, 2004, Plaintiff filed an initial Charge with the EEOC, wherein Plaintiff asserted claims of sexual harassment and retaliation.  (Cohen Ex. A).

147.    On August 19, 2004, Plaintiff amended her Charge expanding the factual allegations of her harassment and retaliation claims ("Amended Charge").  (Cohen Ex. B).

148.    On June 22, 2005, Plaintiff obtained a Right to Sue Letter with respect to the Amended Charge, which was almost two weeks after she resigned from Reader's Digest.  (Cohen Ex. C ¶20, Ex. 6).

149.    Neither the Charge or the Amended Charge filed by Plaintiff allege that she was constructively discharged.  (Cohen Exs. A, B, C ¶20, Ex. 6).

150.    Plaintiff resigned her employment at Readers' Digest on June 10, 2005 -- more than eight months after Reader's Digest terminated D'Urso's employment, more than nine months since her last complaint to anyone at Reader's Digest regarding D'Urso and within only a few days of obtaining a job offer for a position at MBIA.  (Pugni 217; Bobe ¶8; Campbell ¶31; Cohen Exs. E, F).

Dated:   New York, New York
         August 31, 2006

                           Respectfully submitted,
                           McDERMOTT WILL & EMERY LLP

By:      _____
                         Joel E. Cohen (JEC 5312)
                         Dawn Darringer (DJD 4738)
                         Kimberly Nerenberg (KBN 3811)

                         340 Madison Avenue
                         New York, New York 10017
                         (212) 547-5400

                         Attorneys for Defendant
                         The Reader's Digest Association, Inc.